# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Marlin Osthus, Regional Director for the Eighteenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, | Case No. 16-cv-168 (SRN/HB) |
| Petitioner, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| TruStone Financial Federal Credit Union, | |
| Respondent. | |

Ashok Bokde, National Labor Relations Board, 212 3rd Ave S., Ste. 200, Minneapolis, MN 55401, for Petitioner.

Robert C. Castle and Elizabeth A. Patton, Fox Rothschild LLP, 222 South 9th St., Ste. 2000, Minneapolis, MN 55402, for Respondent.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Petitioner Marlin Osthus, Regional Director for the Eighteenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board's (the "Board") Petition for Temporary Injunction ("Petition") [Doc. No. 1].   A hearing on the Petition was held on February 26, 2016. This case presents an especially close call since it appears the Board may ultimately succeed on its underlying claims against Respondent TruStone Financial Federal Credit Union ("TruStone").  However, the threat of irreparable harm is largely lacking.   Thus, for the following reasons, the Petition is denied in part and granted in part.

1

## I.   BACKGROUND

### A.  The Parties' History Regarding the Scope of the Bargaining Unit

TruStone is a credit union which owns and operates a number of branch locations in the metropolitan area around Minneapolis and St. Paul and more recently in Wisconsin.  (Admin. Tr., Vol. 2 at 201–03 [Doc. No. 11-2]; R-1 at 3 and R-2 at 5–6 [Doc. No. 11-5].)[1]  Since 1979, Local 12 of the Office and Professional Employees International Union (the "Union") has been the exclusive bargaining representative for certain TruStone employees in labor relations and negotiations.  (GC-2 ("Cert. of Representative") at 2 [Doc. No. 11-4].)  The employees the Union represents are known as a "unit" which is defined in relevant part as "[a]ll full-time and regular part-time office and clerical employees; excluding managerial employees, temporary employees, . . . professional employees . . . and supervisors  . . . ." (the "Unit") (See Cert. of Representative.)  Important to the present matter, the Unit carries no geographical limitation—e.g., restriction of the Union's representation to employees at certain

---

[1]  The dispute that underlies the Petition was heard by Administrative Law Judge Christine Dibble on January 11–12, 2016.  (National Labor Relations Board Case Nos. 18-CA-158210, 18-CA-163034, 18-CA-165634.)   The Board filed a copy of that Administrative Record with its Petition.   (See List of Transcript Volumes of Administrative Record [Doc. No. 11].)  That record contains the transcript of the administrative hearing, as well as the exhibits the parties introduced during that hearing.  (See Doc Nos. 11-1–11-5.)  The Court refers to the administrative hearing transcript, contained in Doc Nos. 11-1 (Vol. 1) and 11-2 (Vol. 2), as "Admin. Tr." and cites to the page numbers as they appear in the transcript itself.  The Court refers to the Board's administrative exhibits, contained in Doc. Nos. 11-3 and 11-4, by their assigned exhibit number (e.g., GC-1) and cites to the ECF page number since multiple, individually paginated exhibits are contained within each filing.  The Court similarly refers to TruStone's administrative exhibits, contained in Doc. No. 11-5, by their assigned exhibit number (e.g., R-1) and cites the ECF page number since multiple exhibits are contained in that filing.

branches or other geographic locations.  (See id.)

Over time, TruStone opened new branch locations, or relocated existing branches, without contesting that the Union was the representative of Unit employees at the new and relocated facilities.  (See Admin. Tr., Vol. 1 at 93–96, Vol. 2 at 226–27.)  However, in approximately 2010, the parties began to disagree about the scope of the Unit— specifically, whether the Union was the "de facto" representative of Unit employees at newly opened TruStone branches (i.e., the geographic scope of the Unit).  In an effort to resolve this dispute, the Union and TruStone entered into at least two "neutrality agreements."

### 1.  The First and Second Neutrality Agreements

The first agreement ("First Neutrality Agreement") pertained to TruStone's new branch located in the Highland Park neighborhood of St. Paul ("Highland Park Branch"). (See GC-4 ("First Neutrality Agreement") at 29–34 [Doc. No. 11-4].)  That agreement acknowledged that the Union and TruStone failed to resolve their disagreement about the geographic scope of the Unit during their broader collective bargaining efforts in 2010. (First Neutrality Agreement at 29.)  Instead, the parties agreed that the Union would not be recognized as the "de facto" representative of the Highland Park Branch's employees (who would otherwise be encompassed by the Unit) in exchange for TruStone taking a position of neutrality towards the Union and any organizing efforts at the Highland Park Branch.  (See id. at 29–33.)  If the Union established majority status at the Highland Park Branch, the parties agreed that it would become the recognized bargaining representative. (See id. at 32–33.)  The First Neutrality Agreement was signed by both TruStone and the

Union.  (Id. at 34.)

At approximately the same time, the parties entered into a second agreement ("Second Neutrality Agreement") regarding the geographic scope of the Unit at TruStone's new branch located in Northeast Minneapolis ("Northeast Branch").  (R-3 ("Second Neutrality Agreement") at 8–13 [Doc. No. 11-5].)   Other than the specific branch it pertained to, the Second Neutrality Agreement was in all substantive ways identical to the First Neutrality Agreement.  Again, in exchange for TruStone taking a position of neutrality towards the Union and its organizing efforts, the Union agreed that it would not be recognized as the "de facto" representative of office and clerical employees at the Northeast Branch.  (See Second Neutrality Agreement at 8–12.) Although this agreement was not signed by the parties, TruStone claims they agreed that it was effective.[2]  (See id. at 13 (containing no signatures or date); Admin. Tr., Vol. 2 at 209–12, 232.)

Thus, by the terms of the First and Second Neutrality Agreements, the clerical and office employees at TruStone's branches located in Apple Valley, Golden Valley, Maple Grove, Minneapolis, Roseville, St. Cloud, and its Plymouth administrative center were part of the Union's bargaining Unit, while similar employees at the Highland Park and

---

[2] The Union does not explicitly agree that the Second Neutrality Agreement was effective, but it does not contest that the office and clerical employees of the Northeast Branch are not part of its bargaining Unit.  (See Admin. Tr., Vol. 1 at 44, 47–48.)  The specific union representative who was involved in negotiating the Second Neutrality Agreement is no longer employed by the Union and has not provided testimony in this matter.  (See id. at 48–49.)

Northeast Branches were not.[3]   (See First Neutrality Agreement at 29; Second Neutrality Agreement at 8.)

### 2. The Third Neutrality Agreement and the Current Collective Bargaining Agreement

Between late 2012 and early 2013, TruStone alleges that it negotiated a third neutrality agreement ("Third Neutrality Agreement") with the Union as part of a broader collective bargaining effort at that time.  (See Admin Tr., Vol. 2 at 212–14; Resp.'s Mem. in Opp. to Petition ("Mem. in Opp.") at 15–17 [Doc. No. 18].[4])  As evidence, TruStone produced a redlined[5] and unsigned neutrality agreement attached to an email, dated January 25, 2013, sent from TruStone to the Union.   (See R-5 ("Third Neutrality Agreement") at 21–27 [Doc. No. 11-5].)  However, TruStone's only evidence that the Third Neutrality Agreement was ultimately agreed upon is testimony to this effect from its general counsel who was involved in the bargaining process.[6]  (See Admin. Tr., Vol. 2 at 215–17.)   The Union disputes that the unsigned and redlined Third Neutrality Agreement was effectuated between the parties.  (See Pet.'s Mem. in Supp. of Petition

---

[3] As described before, the Union could establish majority status at either the Highland Park or Northeast Branches and become the recognized representative at these facilities.

[4] The Court references the ECF page number assigned to Respondent's Memorandum in Opposition.

[5] "Redlined" is a term that indicates an electronic document contains notations reflecting proposed edits and alterations to the original document.

[6] Again, the Union representative allegedly involved in negotiating the Third Neutrality Agreement is no longer employed by the Union and has not presented testimony in this matter.

("Mem. in Supp.") at 4 [Doc. No. 15].)[7]

The Third Neutrality Agreement is substantively similar to the First and Second Neutrality Agreements. However, an important difference is that the Third Neutrality Agreement purports to apply to all "New Facilities" or "New Branches." (Third Neutrality Agreement at 22–23.) These terms are defined in relevant part as "facilities and branches purchased by [TruStone] or opened by [TruStone] in the State of Minnesota after the effective date of this Neutrality Agreement . . . ." (Id. at 22.) Like the previous agreements, the Third Neutrality Agreement states that, in exchange for TruStone taking a position of neutrality towards the Union organizing at its new branches, the Union agrees that it will not be recognized as the "de facto" representative of office and clerical employees at new branches. (Id. at 23–26.) Also important is the fact that the Third Neutrality Agreement, by its own terms, expired on September 30, 2014, two years after its alleged effective date, October 1, 2012. (Id. at 27.) Despite this fact, TruStone contends that the Third Neutrality Agreement remains in effect between the parties to this day, emphasizing that TruStone is "prepared to honor" its terms. (See Admin. Tr., Vol. 2 at 225, 237–40; Mem. in Opp. at 12–14.)

As the Unit's bargaining representative, the Union has entered into numerous collective bargaining agreements (CBAs) with TruStone over the years. Relevant to the present matter is the CBA currently in effect between the parties (the "Current CBA"). (See GC-22 ("Current CBA") at 82–95 [Doc. No. 11-4].) The Current CBA took effect

---

[7] The Union also questioned the validity of the Third Neutrality Agreement at the hearing held on the Petition.

on October 1, 2014 and is set to expire September 30, 2016, assuming either TruStone or the Union gives the required sixty days notice.[8]  (See Current CBA at 95.)

Two facts about the Current CBA are important to the present matter.  First, its effective date coincides exactly with the expiration of the Third Neutrality Agreement.  (See Current CBA at 95; Third Neutrality Agreement at 27.)  Second, the Current CBA states that TruStone recognizes the Union as the "sole collective bargaining agent" for the Unit, describing the scope of the Unit as it is set forth in the Certification of Representative.  (Current CBA at 84.)  The Unit description carries no geographic limitation, nor is there such a limitation elsewhere in the Current CBA.  (See id.)

### B.  The 2015 Branch Changes and the Resulting Dispute

It is undisputed that in the summer of 2015, TruStone's office and clerical employees at its branches on Olson Memorial Highway in Golden Valley ("Olson Memorial Highway Branch") and in Apple Valley ("Apple Valley Branch") were part of the Union's bargaining Unit.  (See First Neutrality Agreement at 29 (listing these branches as part of the bargaining Unit); Second Neutrality Agreement at 8 (same); Third Neutrality Agreement at 22 (same); Admin. Tr., Vol. 2 at 223 (TruStone's general counsel acknowledging that the CBA between TruStone and the Union applied to these branch locations).)  There were ten Unit employees at the Olson Memorial Highway Branch and five Unit employees at the Apple Valley Branch.  (See Admin. Tr., Vol. 1 at

---

[8] If neither party gives the necessary notice that they wish to end or modify the agreement, the Current CBA continues in force from year to year.  (See Current CBA at 95.)

171–74.)  Under the Current CBA, TruStone "retains the exclusive right to manage all aspects of [its] operation," including determining the number of employees assigned to a location, reducing or consolidating departments, and making staffing and assignment decisions it deems necessary.  (See Current CBA at 85.)  However, if TruStone decides to permanently reassign a Unit employee to a different location "due to the closing or restructuring of a branch," it must follow certain procedures.  (See id. at 91.)  Relevant to the present matter, TruStone must give the employee notice of the reassignment and offer that employee options, including a similar position at a different location.  (See id.)

In the late summer and early fall of 2015, TruStone—without first consulting the Union—notified Unit employees at the Apple Valley and Olson Memorial Highway Branches that those branches would soon close and that TruStone would open new branches in Burnsville ("Burnsville Branch") and on Boone Avenue in Golden Valley ("Boone Avenue Branch").  (See Admin. Tr., Vol. 1 at 21–22, 33, 59–60 and Vol. 2 at 220–22, 272–73, 276–77; GC-5 at 36 [Doc. No. 11-4]; GC-12 at 59 [Doc. No. 11-4]).  The Boone Avenue Branch was less than two miles away from the Olson Memorial Highway Branch while the Burnsville Branch was just over four miles away from the Apple Valley Branch.  (See Mem. in Supp. at 6, n.4 and 7, n.6 (giving the physical distance between these branches according to Google Maps).)  However, TruStone informed the Unit employees that the Burnsville and Boone Avenue Branches would not be Union facilities—i.e., that office and clerical employees at the new branches would not be within the Union's bargaining Unit.  (Admin. Tr., Vol. 1 at 69–70, 133, 137, 155, 174.)

The Unit employees were given the option to transfer to other TruStone branches which were part of the Unit, pursuant to the Current CBA, or accept non-union positions at the new branches.[9]  (See GC-13 ("Apple Valley Employee Memo.") at 62–64 [Doc. No. 11-4]; GC-19 ("Olson Memorial Highway Employee Memo.") at 76–78 [Doc. No. 11-4].)  TruStone provided the Unit employees with information regarding their pay and benefits at the new branches, which included a wage increase and somewhat different healthcare benefits.  (Admin. Tr., Vol. 1 at 70, 72, 133, 136–37, 155–56, 173–74, Vol. 2 at 220–22; GC-6 at 43–46 [Doc. No. 11-4] (consisting of a summary of Union versus TruStone wage and benefits provided to a Unit employee at the Olson Memorial Highway Branch).)  The Board alleges that TruStone told some Unit employees not to discuss aspects of the moves, like scheduling and work conditions at the new branches, with other employees or managers.  (See Admin. Tr., Vol. 1 at 139–41.)  It also claims that later, TruStone told former Unit employees working at the Burnsville Branch not to discuss the fact that there were Union picketers outside that facility with customers.  (See id. at 145–49.)

Of the ten Unit employees at the Olson Memorial Highway Branch, five elected to take non-union positions at the Boone Avenue Branch while four decided to remain in the Unit by transferring to other facilities.[10]  (GC-10 at 54 [Doc. No. 11-4].)  All five of the

---

[9] Unit employees at the Olson Memorial Highway Branch were offered non-union positions at the Boone Avenue Branch; those at the Apple Valley Branch were offered non-union positions at the Burnsville Branch.

[10] One Unit employee left TruStone altogether for unrelated reasons.  (GC-10 at 54 [Doc. No. 11-4]; Mem. in Supp. at 7, n.5.)

Unit employees at the Apple Valley Branch elected to take non-union positions at the Burnsville Branch. (GC-14 at 66 [Doc. No. 11-4].) The Board's position—supported by at least one former Unit employee from the Apple Valley Branch—is that those employees who took non-union positions at the relocated branches did so not because they wished to leave the Union, but because of the logistical considerations (e.g., child care, commutes, etc.) associated with being transferred to other, more distant Union-represented facilities. (See Knudsen Affidavit ("Knudsen Aff.") [Doc. No. 13]; Mem. in Supp. at 8–9.) Overall, the transition to the Burnsville and Boone Avenue Branches reduced the Unit's size by at least ten employees[11]—or roughly ten percent—and its geographic scope from seven to five branch locations. (See Admin. Tr., Vol. 1 at 17–18 (Union representative testifying that in August of 2015, before the branch moves, the Union had approximately 100 Unit employees located at seven facilities).)

TruStone closed or relocated[12] the Olson Memorial Highway and Apple Valley Branches and within days opened the Burnsville and Boone Avenue Branches. (See Admin. Tr., Vol. 1 at 21, 32; GC-5 [Doc. No. 11-4]; GC-12 [Doc. No. 11-4].) The Board claims that the new branches are in most substantive ways (e.g., services offered, staff

---

[11] It is unclear from the record whether additional office and clerical employees, who would fall within the Unit if the Union were recognized, were hired at either the Boone Avenue or Burnsville Branches.

[12] The parties disagree about whether these branch changes consisted of closing existing branches and opening new branches (as TruStone claims), or relocating existing branches (as the Board claims). (See Mem. in Supp. at 4–9; Mem. in Opp. at 20–23.) This distinction is important to the Union's underlying NLRA claims, but is unnecessary to resolve in addressing the Petition. As described later, an administrative law judge found that the branch changes were relocations and rejected TruStone's argument to the contrary.

employed, positions held, staff duties, etc.) identical to the old branches.  (See Admin.

Tr., Vol. 1 at 68, 78, 172; Mem. in Supp. at 6–9.)  Employees at the old branches who

transferred to the new branches were not provided any new job training or new job

descriptions and do not perform new duties.  (See Admin. Tr., Vol. 1 at 75, 78–79, 128–

30, 175.)    TruStone even labelled the Olson Memorial Highway Branch move a

"relocation" in a mailing sent to TruStone customers.  (See GC-18 at 74 [Doc. No. 11-

4].)  Although TruStone largely does not dispute these claims, it clearly considers the

branch changes to be closures and new openings, not relocations.  (See Admin. Tr., Vol.

1 at 29–30, 142–43 and Vol. 2 at 223; Apple Valley Employee Memo. at 61–64

(describing the Apple Valley Branch as closing); Olson Memorial Highway Employee

Memo. at 76–78 (describing the Olson Memorial Highway Branch as being closed);

Mem. in Opp. at 20–23.)

### C.  Procedural Background

As the branch changes described above took place, the Union filed grievances

alleging that TruStone's unilateral withdrawal of Union recognition at the Burnsville and

Boone Avenue Branches violated the Current CBA.[13]  (See GC-11 at 56–57 [Doc. No.

11-4]; GC-15 at 68–69 [Doc. No. 11-4].)  The Union subsequently filed unfair labor

practice claims with the NLRB[14] alleging that TruStone violated the National Labor

---

[13] The Union and TruStone agreed that disputes related to a breach of the Current CBA
would be submitted for arbitration.  (Current CBA at 91–92.)

[14] The National Labor Relations Board (the "NLRB" or the "Board") occupies a dual role
in this matter.  First, it is prosecuting the Union's claims against TruStone and seeks the
preliminary injunction now before the Court as part of that process.  Second, it is

Relations Act ("NLRA") by: (1) refusing to recognize the Union as the bargaining representative of the office and clerical employees at the Burnsville and Boone Avenue Branches; (2) bypassing the Union and dealing directly with Unit employees about their wages and benefits at the new branches; and (3) unilaterally modifying the scope of the bargaining Unit through the branch relocations.  (See GC-1(a)–(e) at 84–92[15] [Doc. No. 11-3].)   Those charges[16] were pending before Administrative Law Judge Christine Dribble (ALJ Dribble) when the Board sought a preliminary injunction pursuant to § 10(j) of the NLRA.  (See Petition; Mem. in Supp. at 1–2.)

Shortly before this Order issued, ALJ Dribble issued her decision.  (See Board's Letter dated April 14, 2016 ("Board's Letter") [Doc. No. 20], Ex. 1 Administrative Law Judge Decision ("ALJ Decision") [Doc. No. 20-1].)  She found that TruStone violated Section 8(a)(5) and (1) of the NLRA by: (1) refusing to recognize the Union at the Burnsville and Boone Avenue Branches; (2) offering Unit employees wage increases and different benefits; and (3) changing the terms and conditions of employment for Unit employees in the process of relocating the branches.  (ALJ Decision at 11.)  However, she dismissed the Union's other NLRA claims.  (See id. at 9–11.)   ALJ Dribble

---

adjudicating, initially through Administrative Law Judge Dribble, the Union's NLRA claims.  For the sake of clarity, when the Court refers to the "Board," it references the NLRB in its role seeking the preliminary injunction at issue here.  When the Court refers to the "NLRB," it references that entity in its administrative adjudicatory capacity under the NLRA.

[15] The Court cites to the ECF page numbers since numerous, individually paginated exhibits are contained within Doc. No. 11-3.

[16] NLRB Case Nos. 18-CA-158210, 18-CA-163034, 18-CA-165634.

recommends an order be entered requiring that TruStone: (1) recognize and bargain with the Union at the Burnsville and Boone Avenue Branches; (2) apply the terms and conditions of employment found in the Current CBA to the Unit employees at those Branches; (3) offer the four employees who elected to transfer to other facilities the option to transfer to the Branches; and (4) compensate any affected Unit employees for lost wages or benefits.  (See id. at 12–13.)

In light of the ALJ Decision, the Board withdrew certain portions of the Petition and related request for injunctive relief, (see Board's Letter at 2, n.2), but also asked that the Court expedite its consideration of the Petition, (see id. at 3).   As it stands, the Board requests an injunction ordering that:

1. TruStone desist in refusing to recognize or collectively bargain in good faith with the Union as the exclusive representative of full and part-time office and clerical employees at the Boone Avenue and Burnsville Branches;

2. TruStone apply the Current CBA to its full and part-time office and clerical employees at the Boone Avenue and Burnsville Branches;

3. TruStone cease making any unilateral changes to Unit employees' terms and conditions of employment;

4. TruStone cease dealing directly with Unit employees concerning their terms and conditions of employment;

5. At the Union's request, TruStone rescind any or all unilaterally implemented changes made to Unit employees' terms and conditions of employment at the Boone Avenue and Burnsville Branches and abide by the terms and conditions set forth in the Current CBA; and

6. TruStone offer any former Unit employee of the Olson Memorial Highway Branch immediate reinstatement at the Boone Avenue Branch.

(See Petition at 18–21.)  This requested relief is almost identical to that recommended by

13

ALJ Dribble.  (Compare Petition at 18–21 with ALJ Decision at 12–14.)

## II.   DISCUSSION

### A.  Legal Standard for Preliminary Injunctions Under the NLRA

The NLRA authorizes the Board to seek, and a district court to grant, "such temporary relief or restraining order as [the court] deems just and proper," in cases involving claims of unfair labor practices.  29 U.S.C. § 160(j).  The justification for these injunctions is the fact that time is usually of the essence in labor disputes, yet their ultimate resolution through the NLRB is slow, which inhibits the objective of eliminating obstructions to the free flow of commerce and private collective bargaining.  See McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC, 786 F.3d 1119, 1122 (8th Cir. 2015) (discussing the legislative history of 29 U.S.C. § 160(j)).  However, this is "a limited exception to the federal policy against labor injunctions."  Sharp v. Parents in Cmty. Action, Inc., 172 F.3d 1034, 1037 (8th Cir. 1999).

The Eighth Circuit applies the traditional four-factor preliminary injunction test when considering a § 10(j) injunction.  S. Bakeries, 786 F.3d at 1122.  Those factors are: (1) the threat of irreparable harm to the movant; (2) the balance of harms between the parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest.  Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). However, when considering a petition for a § 10(j) injunction, the issue of irreparable harm must be addressed first.  S. Bakeries, 786 F.3d at 1123.  Only if the Board clears the "relatively high hurdle" of establishing irreparable harm are the other three factors considered.  Id.

**B. Irreparable Harm**

The Board claims two interrelated forms of irreparable harm resulting from TruStone's conduct. (See Mem. in Supp. at 12–19.) First, the former Unit employees at the Boone Avenue and Burnsville Branches will be denied the benefit of the Current CBA and any future collective bargaining efforts. (See id. at 13–17.) Second, the Union will be forced to bargain with TruStone[17] from a position of reduced power—i.e., representing a bargaining Unit containing ten percent fewer members and two fewer branch locations—a position which is likely to be further weakened by the negative perception amongst employees that the Union is unable to effectively represent them in bargaining with TruStone. (See id. at 14–19.) TruStone argues there is no irreparable harm because no employees lost their jobs, had their salaries or benefits reduced, or were discouraged from union membership or organizing as a result of its branch changes. (See Mem. in Opp. at 32–33.)

"[T]he irreparable harm to be addressed under § 10(j) is the harm to the collective bargaining process or to other protected employee activities if a remedy must await the

---

[17] The resolution of labor disputes, requiring a determination by the NLRB and then enforcement by the relevant federal circuit court of appeals, can often be a "glacial process[]." See Chester ex rel. N.L.R.B. v. Eichorn Motors, Inc., 504 F. Supp. 2d 621, 626 (D. Minn. 2007) (describing the Board's position that resolution of the underlying NLRA claims "could take anywhere between six months and two years"); see also Lineback v. Irving Ready-Mix, Inc., 653 F.3d 566, 570 (7th Cir. 2011) (describing NLRB proceedings as "notoriously glacial"). Here, the Board cannot say precisely how long resolution of the underlying labor dispute will take, but points to a factually similar case where resolution took more than two years. (See Mem. in Supp. at 12–13 (citing King Soopers, Inc. v. N.L.R.B., 254 F.3d 738 (8th Cir. 2001)).) Thus, it is likely that TruStone and the Union will engage in a new round of collective bargaining before the Union's NLRA claims are fully resolved.

Board's full adjudicatory process." Parents in Cmty. Action, 172 F.3d at 1038. The question is whether a preliminary injunction is necessary "to preserve the status quo or to prevent frustration of the basic remedial purpose of the [NLRA]." Id. at 1039. Thus, the focus is not on irreparable injury to specific individuals/employees, but rather whether the allegedly offending conduct "so chilled on-going protected employee activity, such as collective bargaining or union organizing, that delay will frustrate the effectiveness of the [NLRB's] remedies." Id. at 1040.

### 1. TruStone's Conduct

Section 10(j) injunctions are appropriate "for serious and extraordinary cases when the remedial purpose of the [NLRA] would be frustrated unless immediate action is taken." Parents in Cmty. Action, 172 F.3d at 1037 (quotations omitted). "Granting a preliminary injunction in situations other than when 'the remedial purpose of the Act would be frustrated unless immediate action is taken . . . would effectively circumvent the normal N.L.R.B. processes established by the [NLRA] and muddle the proper allocation of administrative and judicial functions.'" S. Bakeries, LLC, 786 F.3d at 1123 (quoting Minnesota Min. & Mfg. Co. v. Meter for & on Behalf of N. L. R. B., 385 F.2d 265, 270 (8th Cir. 1967)). Thus, these injunctions issue where an employer's egregious conduct is likely to chill protected activities under the NLRA—conduct such as a total withdrawal of union recognition, the firing of some or all union employees, patently prohibited efforts to discourage unionization, or a complete refusal to bargain with a union. See, e.g., Osthus v. A.S.V., Inc., No. 14-cv-4445 (ADM/HB), 2015 WL 1530434 (D. Minn. Apr. 2, 2015) (employer threatened employees attempting to unionize with

16

plant closure and implied it would refuse to bargain with any union); <u>Hubbel v. Patrish</u> <u>LLC</u>, 903 F. Supp. 2d 813, 817 (E.D. Mo. 2012) (employer "completely eliminated the bargaining unit and replaced the union workers with non-union members after flat-out refusing to negotiate with the union"); <u>Osthus v. Vincent/Metro Trucking, LLC</u>, No. 09-cv-1726 (DSD/JJK), 2009 WL 2516165 (D. Minn. Aug. 14, 2009) (employer repeatedly solicited union employees to sign a document stating they no longer wished to be represented by the union, withdrew recognition of union, and refused to implement a collective bargaining agreement); <u>Chester v. CMPJ Enterprises</u>, No. 07-cv-2530 (MJD), 2007 WL 1994045 (D. Minn. July 2, 2007) (employer refused to retain or hire union employees and would not recognize or bargain with the union); <u>Chester ex rel. N.L.R.B.</u> <u>v. Eichorn Motors, Inc.</u>, 504 F. Supp. 2d 621, 627 (D. Minn. 2007) (employer "eviscerated the bargaining unit, having terminated its entire team of active Union supporters"); <u>Sharp v. Miller Waste Mills, Inc.</u>, 22 F. Supp. 2d 1006 (D. Minn. 1998) (employer withdrew all union recognition and began addressing employee grievances itself after previously engaging in unfair labor practices and undermining union support); <u>Sharp for & on Behalf of N.L.R.B. v. Koronis Parts, Inc.</u>, 927 F. Supp. 1208 (D. Minn. 1996) (employer disciplined several employees, including terminating one, who were attempting to unionize, and undertook other anti-union efforts).

Even the cases cited by the Board in support of its irreparable harm argument show that injunctions are limited to extraordinary circumstances, such as where an employer withdraws all union recognition, categorically refuses to bargain with a recognized union, or terminates union employees.  <u>See, e.g.</u>, <u>Kreisberg v. HealthBridge</u>

17

Mgmt., LLC, 732 F.3d 131 (2d Cir. 2013) (employer unilaterally changed work conditions, locked out union employees, and ultimately replaced all striking union employees with non-union employees); Lineback v. Irving Ready-Mix, Inc., 653 F.3d 566 (7th Cir. 2011) (employer withdrew all recognition of the union, bargained directly with union employees, and forced the union to end a strike and accept less favorable employment terms); Small v. Avanti Health Sys., LLC, 661 F.3d 1180 (9th Cir. 2011) (employer acquired hospital where nurses were represented by union, but refused to recognize or bargain with that union); Frankl v. HTH Corp., 650 F.3d 1334 (9th Cir. 2011) (employer refused to recognize or bargain with a union and fired several employees who were union activists); Bloedorn v. Francisco Foods, Inc., 276 F.3d 270 (7th Cir. 2001) (employer refused to hire union employees after acquiring a facility where a union was recognized so as to prevent the union from achieving majority status); Muffley v. APL Logistics Mgmt. Warehouse Servs., Inc., No. 3:08CV-26-R, 2008 WL 544455 (W.D. Ky. Feb. 27, 2008), opinion clarified, No. 3:08-CV-26-R, 2008 WL 4561573 (W.D. Ky. Oct. 10, 2008) (employer withdrew all union recognition and categorically refused to bargain with the union); Moore-Duncan ex rel. N.L.R.B. v. Horizon House Developmental Servs., 155 F. Supp. 2d 390 (E.D. Pa. 2001) (employer refused to bargain in any way with recognized union); see also S. Bakeries, 786 F.3d 1119, 1124–25 (summarizing Irving Ready-Mix, HTH Corp., and Francisco Foods as standing for the rule that "if an employer replaces pro-union employees with nonunion employees, continues to blatantly violate the Act, or refuses to bargain and unilaterally withdraws recognition from a union that has demonstrated support, a preliminary

injunction may appropriately prevent or counteract the decline in support for the union that is likely to follow.").

TruStone's conduct is considerably less "severe" than that described in the cases above.[18]  TruStone did not fire any Union employee and all Union employees were offered the choice of relocating to a branch where TruStone recognized the Union, or non-union positions at the new branches.  Those employees who took non-union positions have terms of employment (e.g., wages and benefits) similar to those they enjoyed under the Current CBA.  Most importantly, TruStone still recognizes the Union and is prepared to bargain with it, including about the branch relocations and the scope of the Unit.  (See Mem. in Opp. at 26.)  Thus, the circumstances of this case are different than those where courts generally grant injunctive relief.

### 2.  The Potential Harm

As described above, the Board alleges that the Union will suffer two types of harm as a result of TruStone's conduct.  First, it claims that the non-union employees at the relocated branches are, and will continue to be, denied the benefit of Union representation in collective bargaining.  Second, it contends that the collective bargaining process is harmed because the Union will be forced to bargain with TruStone from a weakened position (i.e., representing fewer Unit members at fewer branch locations).

---

[18] This conclusion in no way suggests that the Court condones or approves of TruStone's conduct in connection with relocating the branches.  That conduct may well have violated the Current CBA and the NLRA.  In fact, ALJ Dribble found that it did.  Like ALJ Dribble, the Court is particularly skeptical of TruStone's reliance on the redlined, unsigned, and expired Third Neutrality Agreement as justification for its unilateral "redefining" of the Union's bargaining Unit.  However, it is not for this Court to rule on the merits of the Union's underlying arbitration grievance or NLRA claims.

However, these harms are not truly irreparable, and thus not of the sort warranting a § 10(j) injunction.

Again, injunctive relief is reserved to prevent harms that frustrate the remedial purposes of the NLRA, or the effectiveness of subsequent NLRB remedial measures.  S. Bakeries, 786 F.3d at 1123; Parents in Cmty. Action, 172 F.3d at 1037, 1040.  Personal harm to individual employees, which monetary relief would remedy, is not irreparable harm.  See Parents in Cmty. Action, 172 F.3d at 1040 (no irreparable harm where any harm to discharged employee could be monetarily compensated); Eichorn Motors, 504 F. Supp. 2d at 628 (employer's unilateral changes to employee's wages, training pay, and the employee evaluation process did not constitute irreparable harm since those alleged violations "can be easily and fully compensated by monetary damages to any affected employees").  If the NLRB's normal adjudicatory processes are likely to be as effective as injunctive relief at addressing the alleged harm, then there is no irreparable harm.  See S. Bakeries, 786 F.3d at 1125.

The fact that non-union employees at TruStone's relocated branches are presently without the benefits of collective bargaining is not irreparable harm warranting an injunction.  Damage to these employees from lost wages or benefits is monetarily compensable and thus not irreparable.  See Parents in Cmty. Action, 172 F.3d at 1040; Eichorn Motors, 504 F. Supp. 2d at 628.  Moreover, it appears that the wages and benefits they receive as non-union employees are commensurate with those they received under the Current CBA, significantly reducing or eliminating any damages suffered.

Nor is the Union's weakened collective bargaining position irreparable harm.

TruStone still recognizes the Union as the bargaining representative of over 80 employees at numerous branch/facility locations and will collectively bargain with the Union.  Moreover, when that time comes, collective bargaining will occur in the shadow of the Union's pending NLRA claims—many of which the Union recently succeeded on before ALJ Dribble.  TruStone must bargain with the knowledge that the Union may ultimately prevail on those claims and thus its bargaining position is not appreciably enhanced.

Most importantly, the NLRB is well-equipped to remedy much of the damage done to the Union if it ultimately rules in the Union's favor on the NLRA claims.  The NLRB could order TruStone to recognize the Union at the relocated branches and require that TruStone bargain with the Union in light of the re-established bargaining unit.  See Beverly Enterprises, Inc. & Its Subsidiary Beverly Health & Rehab. Servs., Inc., & Its Subsidiary Beverly Enterprises-Florida, Inc., d/b/a Beverly Health & Rehab Ctr.-Paradise Pines & d/b/a Suwanee Healthcare, & Individual Facilities & Each of Them; & Beverly Enterprises, Inc. & Its Subsidiary Spectra Healthcare All., Inc., & Its Subsidiary Beverly Rehab., Inc., & Individual Facilities & Each of Them & United Food, 341 NLRB 296, 307 (2004) (holding that an employer's transfer of union employees outside the bargaining unit violated the NLRA and ordering the employer to recognize the union as the bargaining representative of the transferred employees); Nexstar Broad. Grp., Inc., d/b/a Wetm-TV & Int'l All. of Theatrical Stage Employees & Moving Picture Technicians, Artists & Allied Crafts of the United States, Its Territories & Canada, AFL-CIO, 363 NLRB No. 32 (Oct. 30, 2015) (ordering that an employer recognize the scope

of the union's bargaining unit to encompass certain disputed employee positions and bargain with the union accordingly); Mt. Sinai Hosp. & 1199, Nat'l Health & Human Serv. Employees Union, 331 NLRB 895, 912 (2000) (same).   In fact, the remedy recommended in the ALJ Decision is almost identical to the injunctive relief requested in the Petition.  See S. Bakeries, 786 F.3d at 1125 (where "the ordinary adjudicatory process is likely to be as effective as interim relief," there is not irreparable harm).  Given the NLRB's ability to subsequently redress most of the harm stemming from TruStone's branch relocations, the Court cannot conclude that the injunctive relief requested is necessary.

However, as discussed below, the Court does grant limited injunctive relief to prevent frustration of the effectiveness of any ultimate NLRB remedy.  See Parents in Cmty. Action, 172 F.3d at 1040.

### 3.  The ALJ Decision

The ALJ Decision in favor of the Union increases the Union's ultimate likelihood of success on the merits of those claims.  That decision, combined with the length of time it will take to finally resolve the underlying NLRA claims, highlight why limited injunctive relief is appropriate in this case.

ALJ Dribble by-in-large rejected TruStone's arguments that it had not violated the NLRA in the process of relocating its branches.  First, ALJ Dribble dismissed TruStone's contention that the branch moves were not relocations.  (See ALJ Decision at 6 ("The facts show that these were relocations, essentially transferring unit work to nearby locations with most of the employees in the new locations transferring from the old

locations . . . .  It is significant that no new training was offered to the employees who transferred to the new locations, thus confirming that the work would be and actually was the same in the new location as in the old.").)  Under those circumstances, TruStone "was not permitted [under the NLRA] to withdraw recognition from the Union or fail to apply the [Current CBA] with respect to the moved locations."  (Id. at 6–7.)

Second, ALJ Dribble found that neither the Current CBA nor the Third Neutrality Agreement allowed TruStone to withdraw recognition from the Union or refuse to comply with the Current CBA.  (See id. at 7–8.)  In particular, ALJ Dribble declined to consider the unsigned, redlined, and expired Third Neutrality Agreement as evidence that the parties intended to allow TruStone to withdraw recognition from the Union as it did.  (See id.)  Third, ALJ Dribble found that TruStone violated the NLRA when it: (a) "coercively" suggested to affected Unit employees that, to remain in the Union, they would have to "bump" other Unit employees or transfer to other facilities, (b) attempted to entice these employees to take non-union positions with wage increases and different health benefits, and (c) discriminated against Unit employees by not offering them the option to transfer to the relocated branches and remain in the Union.  (See id. at 8–10.)

Presumably, TruStone intends to file exceptions to the ALJ Decision with the NLRB.  (See TruStone's Letter dated April 20, 2016 ("TruStone's Letter") at 4–5 [Doc. No. 21] (noting the non-binding nature of the ALJ Decision and TruStone's right to appeal).)  Thus, the recommended order will not take effect, if at all, until the NLRB rules on those exceptions, and potentially not until the Eighth Circuit Court of Appeals considers the issue.  See Reliance Ins. Companies v. N.L.R.B., 415 F.2d 1, 6 (8th Cir.

1969) (describing how neither the NLRB nor the circuit court of appeals are bound by the conclusions or recommendations of the ALJ); <u>Schaub v. W. Michigan Plumbing & Heating, Inc.</u>, 250 F.3d 962, 968 (6th Cir. 2001) ("The ALJ's decision is only a recommendation, which requires the Board's resolution of the Union's exceptions to that decision.").

The Board offers two arguments regarding the significance of the ALJ Decision. First, it argues that the ALJ Decision substantially increases the likelihood this Union will succeed on its remaining NLRA claims, favoring the issuance of an injunction.  (<u>See</u> Board's Letter at 2.)  Second, because the ALJ's Decision "has no final force or effect," until the NLRB acts, the Board argues that "[a]bsent prompt injunctive relief, a final [NLRB] order could be rendered meaningless, and the harm to employees' statutory rights will be irreparable."  (<u>Id.</u> at 2–3.)

TruStone disagrees about the significance of the ALJ Decision to the pending Petition.  (<u>See</u> TruStone's Letter.)  First, TruStone argues that because there is no irreparable harm, the Court should not consider any enhancement to the Union's likelihood of success on its NLRA claims.  (<u>Id.</u> at 3–4 (citing <u>S. Bakeries</u>).)  Second, TruStone notes that the ALJ Decision is not binding, may well be overturned on appeal, and actually "vindicated" TruStone's position that it did not act with any "anti-union animus" when it relocated the branches.  (<u>Id.</u> at 4–5.)  Third, TruStone highlights what it sees as the Union's "failure to act" by not establishing majority support at the relocated branches, pursuing its grievance under the Current CBA, seeking an NLRB clarification

of the Unit's scope, and its several month delay in seeking injunctive relief.[19]   (Id. at 1–

2.)

The Court agrees with the Board that the ALJ Decision increases the likelihood

the Union will succeed on its remaining NLRA claims against TruStone.  Not only is ALJ

Dribble's legal analysis persuasive, but the NLRB's affirmation of an ALJ's findings is

afforded great deference.  See Lineback v. Spurlino Materials, LLC, 546 F.3d 491, 502,

n.4 (7th Cir. 2008) ("The ALJ's opinion certainly is relevant to the propriety of section

10(j) relief.   Evaluating the [Board's] likelihood of success calls for a predictive

judgment about how the NLRB is likely to rule.  The ALJ is the NLRB's first-level

decisionmaker, and, having presided over the merits hearing, the ALJ's factual and legal

determinations supply a useful benchmark against which the [Board's] prospects of

success may be weighed." (quotations omitted)); see Cintas Corp. v. N.L.R.B., 589 F.3d

_____

[19] TruStone's "failure to act" argument is without merit.  First, a delay of a few months in pursuing injunctive relief does not bar a finding of irreparable harm.  S. Bakeries, 786 F.3d at 1125 (finding that a seven month delay between the alleged NLRA violations and seeking a preliminary injunction did not bar finding irreparable harm because complicated labor disputes take time to investigate and litigate).  Second, the Union's right to pursue its NLRA claims before the NLRB is distinct from any grievance it might pursue under the Current CBA.  Whether TruStone violated the Current CBA or the NLRA are separate questions with separate forums for redress.  Third, the Union's position is that it is under no obligation to establish majority support at the Burnsville or Boone Avenue Branches because the Third Neutrality Agreement is not binding and the Unit, as set forth in the Current CBA, encompasses both branches.  ALJ Dribble agreed with this position.  Finally, TruStone's contention that the Union should seek a Unit clarification from the NLRB rings hollow.  The Union does not believe the Unit needs clarification because it unambiguously encompasses the relocated branches.  Moreover, Trustone could have sought clarification of the Unit's scope, but did not.  Instead, it unilaterally altered the scope of the Unit by relocating the branches and withdrawing Union recognition.  In doing so, TruStone ran the risk that the Union would bring claims against it under the NLRA, a remedy explicitly afforded under the Act.  TruStone cannot now complain the Union has availed itself of that statutorily provided remedy.

905, 912 (8th Cir. 2009) (describing the standard for affording "great deference" to the NLRB's affirmation of an ALJ's findings).  However, as described above, the first and primary consideration for the Court in the § 10(j) injunction analysis is irreparable harm.

The extensive time it takes to resolve NLRA claims is considered in the irreparable harm analysis.  See Parents in Cmty. Action, 172 F.3d at 1040 (8th Cir. 1999) ("the §10(j) injury focuses on whether [the employer's allegedly offending behavior] so chilled on-going protected employee activity, such as collective bargaining or union organizing, that delay will frustrate the effectiveness of the [NLRB] remedies"); Eichorn Motors, 504 F. Supp. 2d at 628 ("Absent interim action, the Court finds remedial measures may be impaired, because the discharged employees may not be available for reinstatement after the painfully extended time which may elapse before the Board issues a final order.  The Court finds that, absent [an injunction reinstating some discharged employees], the Union will experience irreparable harm to its ability to bargain collectively.").  If an employer's efforts to reduce support for a union will be exacerbated by the time it takes to resolve the underlying NLRA claims, an injunction may be warranted.  See Avanti Health Sys., 661 F.3d at 1193 ("Once the union's support has diminished, it will likely suffer irreparable harm because '[w]ith only limited support . . . the Union will be unable to bargain effectively regardless of the ultimate relief granted by the [NLRB].'" (quoting Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates, 241 F.3d 652, 667 (9th Cir. 2001)); N.L.R.B. v. Electro-Voice, Inc., 83 F.3d 1559, 1573 (7th Cir. 1996) ("As this case demonstrates, years may pass before the [NLRB] reaches the merits of a case.  As time passes the likelihood of union formation diminishes, and the

likelihood that the employees will be irreparably deprived of union representation increases. … The union's position in the plant may deteriorate to the point that effective organization and representation is no longer possible.  As time passes, the benefits of unionization are lost and the spark to organize is extinguished.  The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable.  That loss, combined with the likelihood that the [NLRB's] ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process." (citations omitted)).  As one court succinctly summarized the problem:

> The bargaining process is harmed when an employer's actions weaken a union, and that union's ability to provide effective representation is diminished.  If the union cannot negotiate for better terms and conditions of employment, the interest of the employees in representation will dissipate.  The impotence of the union and the loss of employee interest can create a mutually reinforcing cycle, as a lack of support among employees further diminishes the union's strength and, consequently, its ability to press for improvements that would demonstrate its worthiness to the members of the bargaining unit.  If negotiations are eventually ordered by the N.L.R.B. at the end of the administrative process, a union which has been weakened in the interim by the employer's actions will be hard-pressed to secure improvements in wages and benefits at the bargaining table.

Moore-Duncan ex rel. N.L.R.B. v. Horizon House Developmental Servs., 155 F. Supp. 2d 390, 396 (E.D. Pa. 2001).

The Board argues that the Union's reduced Unit size, combined with a general waning of employee support for the Union (i.e., employees perceiving the Union as weak in the face of TruStone's unilateral relocations and withdrawal of Union recognition), will hinder the Union's ability to bargain effectively with TruStone.  (Mem. in Supp. at

17–19.)  As described above, the NLRB is capable of remedying TruStone's unilateral reduction of the bargaining Unit and ordering new collective bargaining.  See supra Part II.B.2.  The question then is whether injunctive relief is necessary to prevent a reduction in employee support for the Union while its NLRA claims are pending.

### 4.  Limited Injunctive Relief is Warranted

Limited injunctive relief is warranted to prevent a reduction in support for the Union while the NLRA claims are resolved.  However, this relief must be carefully tailored since TruStone's acts are not of the egregious sort warranting more "intrusive" injunctive relief (e.g., interim bargaining orders, reinstatement of discharged union employees, etc.).  See A.S.V., 2015 WL 1530434 at *8 (largely denying the injunctive relief requested but enjoining the employer from any further NLRA infractions and requiring that the employer post copies of the court's order at its workplace).  TruStone's employees—especially those at the Boone Avenue and Burnsville Branches who were formally part of the bargaining Unit—should be aware of the Union's efforts at challenging TruStone's actions.  If employees are aware of the Union's work to "undo" TruStone's allegedly offending acts and fight for those employees the Union considers part of the bargaining Unit, the risk of the Union being perceived as weak or ineffective is reduced.  Such awareness will also put in context any collective bargaining between TruStone and the Union while the NLRA claims are pending.  Although TruStone does not presently recognize the Union at the relocated branches, it may later be forced to and re-bargain accordingly.

There is no harm to TruStone in truthfully notifying its employees of the current

state of the adjudication of the dispute between it and the Union.

## III.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Petitioner Marlin Osthus, Regional Director for the Eighteenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board's Petition for Temporary Injunction [Doc. No. 1] is **DENIED IN PART AND GRANTED IN PART** as follows:

   a. Within ten days of the date of this Order, Respondent TruStone Financial Federal Credit Union ("TruStone") will post, in places where notices to employees are customarily posted, at each of its facilities and branches where it recognizes Local 12 of the Office and Professional Employees International Union (the "Union") as well as at its Burnsville and Boone Avenue Branches, a copy of the attached Notice;

   b. As stated in the Notice, TruStone will provide a copy of ALJ Dribble's decision and recommended order to any of its employees who request one;

   c. The Notices will remain posted until such time as the Union's NLRA claims against TruStone are fully resolved, or there is a change in the posture of those claims such that the Notice is no longer accurate.  If either party believes the Notices are no longer accurate, it may bring a motion before this Court requesting that the Notices be altered or removed;

   d. TruStone will take reasonable steps to ensure that the Notices are not altered, defaced, or covered by any other material;

   e. Within ten days of the date of this Order, TruStone will file a sworn affidavit attesting to the steps it has taken to comply with this Order;

   f. In all other respects, the Petition is **denied**.

Dated: April 26, 2016                      s/ Susan Richard Nelson
                                           SUSAN RICHARD NELSON
                                           United States District Judge

# NOTICE TO EMPLOYEES

Posted by Order of the
United States District Court
for the District of Minnesota

The purpose of this Notice is to inform employees of TruStone Financial Federal Credit Union ("TruStone") about an ongoing labor dispute between TruStone and Local 12 of the Office and Professional Employees International Union (the "Union").  This dispute is currently pending before the National Labor Relations Board ("NLRB").

The Union alleges that TruStone violated the National Labor Relations Act ("NLRA") in 2015 when it relocated its facility on Olson Memorial Highway in Golden Valley to Boone Avenue North in Golden Valley ("Boone Avenue Branch"), and its facility on Galaxie Avenue in Apple Valley to Nicollet Court in Burnsville ("Burnsville Branch").

More specifically, the Union alleges that TruStone violated the NLRA by refusing to recognize the Union as the collective bargaining representative for certain clerical and office employees at the Burnsville and Boone Avenue Branches and by refusing to comply with the terms of the current collective bargaining agreement.

TruStone denies that it violated the NLRA.

On April 13, 2016, Administrative Law Judge Christine Dribble ("ALJ Dribble") found in favor of the Union and concluded that TruStone violated the NLRA.  Based on these findings, ALJ Dribble issued a recommended order.  However, this recommended order *is not binding or effective*.  TruStone has the right to appeal ALJ Dribble's decision and recommended order to the NLRB and plans to do so.

It cannot be said with certainty when this labor dispute will be fully resolved.

Should the NLRB, or a relevant court, ultimately hold that TruStone violated the NLRA as the Union claims, TruStone may be required to, among other things:

1.  Recognize the Union as the collective bargaining representative of certain clerical and office employees at the Boone Avenue and Burnsville Branches;

2.  Apply the terms of any existing collective bargaining agreement with the Union to those clerical and office employees at the Boone Avenue and Burnsville Branches;

3.  Bargain with the Union regarding the terms and conditions of employment for employees represented by the Union at the Boone Avenue and Burnsville Branches;

4.  Offer certain employees, who elected to transfer to other TruStone branches and facilities in order to remain in the Union during the branch relocations, the option to transfer to the Boone Avenue or Burnsville Branches;

5.  Make affected employees at the Boone Avenue and Burnsville Branches whole for any losses they suffered as a result of TruStone's failure to apply the terms of the collective bargaining agreement(s) to them.

Again, TruStone is not presently required to take any of the steps described above, nor will it be required to if it ultimately prevails in this dispute.

You may request a copy of ALJ Dribble's decision and recommended order from TruStone's Human Resources Department.

Dated:  April 26, 2016                    s/ Susan Richard Nelson
                                          SUSAN RICHARD NELSON
                                          United States District Judge